UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/16
```

-------------------------------------------x
                                                :

E.M. and J.M., on behalf of their child,   :
M.M.,
                                                :

                             Plaintiffs,   :

                                            :        15-cv-01895

                       v.                :        15-cv-01898

NEW YORK CITY DEPARTMENT OF     :     **OPINION**
EDUCATION and CARMEN FARIÑA, in   :
her official capacity as Chancellor of the :
New York City Department of Education, :

                         Defendants.   :

-------------------------------------------x

Plaintiffs E.M. and J.M., on behalf of their child M.M., brought these actions (now consolidated) against defendants New York City Department of Education ("DOE") and Carmen Fariña, in her official capacity as chancellor of the DOE, on March 12, 2015, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400, *et seq.* Plaintiffs allege that defendants failed to provide M.M. with a free appropriate public education ("FAPE") for both the 2011-12 and 2012-13 school years. During each of these school years plaintiffs rejected the DOE's public school placement for M.M., enrolled M.M. at a private school, and sought tuition reimbursement from the DOE. Both years, an Impartial Hearing Officer ("IHO") granted plaintiffs' request for reimbursement. The DOE appealed the IHO decisions and, each time, a State Review Officer ("SRO") reversed the IHO's conclusion and vacated

1

the order for reimbursement. Plaintiffs now seek to overturn these SRO
decisions. The parties have cross-moved for summary judgment. For the
reasons stated below, the Court grants plaintiffs' motion and denies
defendants' motion.

## **BACKGROUND**

### I. *Legal Framework*

The IDEA ensures "that all children with disabilities have available to
them a free appropriate public education that emphasizes special education
and related services designed to meet their unique needs and prepare them for
further education, employment, and independent living." 20 U.S.C.
§1400(d)(1)(A). "To ensure that qualifying children receive a FAPE, a school
district must create an individualized education program ('IEP') for each such
child." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).
The IEP must describe the specially designed instruction and services that will
enable the child to meet stated educational objectives and it must be
reasonably calculated to provide educational benefits to the child. *M.W. ex rel.
S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013).

In New York State, a local Committee on Special Education ("CSE")
creates an IEP for each disabled student in the CSE's school district. N.Y.
Educ. Law §4402(1)(b)(1); *F.O. v. New York City Dep't of Educ.*, 976 F. Supp. 2d
499, 505 (S.D.N.Y. 2013). "CSEs are comprised of members appointed by the
local school district's board of education, and must include the student's
parent(s), a regular or special education teacher, a school board representative,

2

a parent representative, and others." *R.E.*, 694 F.3d at 175 (citing N.Y. Educ. Law §4402(1)(b)(1)(a)). The CSE provides general placement information in the IEP but does not identify the specific school site where the student will be assigned. *Scott ex rel. C.S. v. New York City Dep't of Educ.*, 6 F. Supp. 3d 424, 428 (S.D.N.Y. 2014). The DOE informs the student's parents of the particular school site through a final notice of recommendation ("FNR") at a later date. *Id.*

Parents who believe that the state has failed to provide their child with a FAPE "may unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement." *Id.* If granted, the reimbursement is for expenses that the school district "should have paid all along and would have borne in the first instance had it developed a proper IEP." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009).

To obtain retroactive tuition reimbursement, a parent must first file a "due process complaint" with the DOE that challenges the IEP's compliance with the IDEA. *R.E.*, 694 F.3d at 175. After the complaint is filed, New York law provides for a hearing before an IHO during which the state has the burden of proving the adequacy of the proposed IEP and the parent seeking tuition reimbursement for an alternative placement bears the burden of proving that the alternative placement is appropriate. *F.O.*, 976 F. Supp. 2d at 506 (citing N.Y. Educ. Law §4404(1)). Either party may appeal the IHO's decision to an SRO. N.Y. Educ. Law §4404(2). Additionally, either party may challenge the

3

SRO's decision in state or federal court. 20 U.S.C. §1415(i)(2)(A); N.Y. Educ. Law §4404(3)(a).

## II. *Facts and Procedural History*

### A. Overview

Plaintiffs E.M. and J.M. are the parents of M.M. At the beginning of the 2011-12 school year, M.M. was fifteen years old. At the beginning of the 2012-13 school year, M.M. was sixteen years old. M.M. has been diagnosed with cerebral palsy. She has severe cognitive delays and speech/language deficits. She is non-ambulatory, confined to a wheelchair, and requires assistance for routine tasks. In both 2011 and 2012, M.M. was classified by the DOE as a student with a disability having an orthopedic impairment.

From second grade through the end of middle school, the DOE placed M.M. in special classes with a 12:1 student-teacher ratio at public schools. During the 2010-11 school year, when M.M. was in ninth grade, a dispute between the parties was developing about M.M.'s education and she was enrolled at the Cooke Center Academy ("Cooke"), a private school. At Cooke, M.M. attended classes of up to twelve students. She also received full-time paraprofessional services, counseling, occupational therapy, physical therapy, and speech/language therapy.

### B. 2011-12 School Year

On April 1, 2011, the local CSE convened a meeting to develop M.M.'s IEP for the 2011-12 school year. The CSE recommended that M.M. be placed in

a special class with a 15:1 student-teacher ratio for 25 periods per week at a public community school with related services including counseling, occupational therapy, physical therapy, speech/language therapy, and a 1:1 health paraprofessional. Plaintiffs' counsel wrote a letter to the DOE on June 10, 2011 noting that plaintiffs disagreed with the CSE's IEP, and stating that plaintiffs intended to unilaterally place M.M. at Cooke and seek reimbursement. On June 28, 2011, plaintiffs filed a due process complaint with the DOE alleging that the DOE had denied M.M. a FAPE.

On July 26, 2011, J.M. executed an enrollment agreement with Cooke for M.M.'s attendance during the 2011-12 school year. Pursuant to that contract, J.M. agreed to pay $48,500 in tuition plus $28,000 for a paraprofessional. The contract further provided that J.M. would not be personally liable for the tuition and paraprofessional cost if she could receive funding from the DOE.

By FNR dated August 9, 2011, the DOE informed plaintiffs that, in accordance with the IEP, it recommended M.M. be placed at the Murry Bergtraum High School for Business Careers ("Murry Bergtraum"), which is a public school. Plaintiffs rejected the DOE's recommendation that M.M. be placed at Murry Bergtraum and they unilaterally enrolled her at Cooke. Plaintiffs then filed an amended due process complaint with the DOE on November 30, 2011.

The IHO assigned to adjudicate plaintiffs' claim for private school tuition reimbursement held multiple hearings between August 2011 and May 2012. The IHO issued her decision on June 18, 2012 and concluded that plaintiffs

5

were entitled to reimbursement for M.M.'s enrollment at Cooke for the 2011-12 school year. In reaching her decision, the IHO disagreed with the CSE's recommendation of a 15:1 program for M.M. The IHO cited testimony by Jacqueline Giurato, a DOE representative, who testified that a 12:1 program does not exist at the high school level. (I-Tr. 296:25-297:8).[1] Based on this and related testimony, the IHO held that "the CSE changed M.M.'s class size recommendation from 12:1 to 15:1 simply because she was now a high-school aged student and the DOE's high schools do not have 12:1 classes." (I-IHO at 5).

Moreover, the IHO noted that the DOE's placement included some classes in a general education setting even though "the IEP prepared by the CSE acknowledges that M.M. cannot be educated in the general education classroom." (I-IHO at 5). The IHO also observed that Murry Bergtraum "has limited physical therapy and does not provide occupational therapy," which "are integral parts of M.M.'s special education program." (I-IHO at 5). Thus, in the IHO's view, the DOE did not meet its burden of proving that it offered M.M. a FAPE for the 2011-12 school year.

Next, the IHO found that plaintiffs met their burden of proving that Cooke was an appropriate placement for M.M. Finally, the IHO concluded that equitable factors favored reimbursement and ruled that plaintiffs were entitled

---

[1] Record citations marked "I" refer to materials from the 2011-12 school year, and citations marked "II" refer to materials from the 2012-13 school year.

to tuition reimbursement for the cost of M.M.'s enrollment at Cooke for the 2011-12 school year.

Defendants appealed the IHO's decision on July 23, 2012. In a decision dated November 14, 2014, the SRO reversed the IHO, holding that the DOE met its burden of proving that it offered M.M. a FAPE for the 2011-12 school year. The SRO concluded that a 15:1 special class placement was appropriate for M.M. because, among other reasons, "the student's academic skills were similar to other students that would attend a 15:1 setting." (I-SRO at 8). Additionally, the SRO found that, "unlike students in a 12:1+1 special class placement, the student did not present with a learning disability or a speech or language impairment." (I-SRO at 8).

The SRO also held that plaintiffs' argument that the DOE would not be able to implement the IEP at Murry Bergtruam was speculative in light of the fact that they had unilaterally enrolled M.M. at Cooke. The SRO noted, however, that even if plaintiffs were permitted to make speculative claims, the evidence did not demonstrate that the DOE would have failed to properly implement the IEP. Because the SRO found that the DOE provided M.M. with a FAPE, the SRO did not reach the issue of whether Cooke was an appropriate placement or whether equitable factors favored reimbursement.

Plaintiffs appealed the SRO's reversal of the IHO decision regarding the 2011-12 school year to the federal district court in a complaint dated March 12, 2015.

## C. 2012-13 School Year

The CSE convened once again on March 8, 2012 to conduct M.M.'s annual review and develop an IEP for the 2012-13 school year. The CSE recommended that M.M. be placed in special classes with a 15:1 student-teacher ratio for math, English language arts, social studies, and sciences at a community school. Other classes, however, would be in a general education setting. The IEP also called for M.M. to receive related services consisting of speech/language therapy, physical therapy, occupational therapy, and counseling services. Additionally, the CSE recommended a 1:1 health paraprofessional and two sessions per week of special education teacher support services for math.

By FNR dated July 31, 2012, the DOE informed M.M.'s parents that it had assigned her to Marta Valle High School ("Marta Valle"). M.M.'s parents disagreed with this placement and the 15:1 student-teacher ratio adopted by the CSE. In a letter dated August 24, 2012, M.M.'s parents notified the DOE of their intention to again unilaterally place M.M. at Cooke and seek tuition reimbursement. J.M. executed an enrollment contract with Cooke that required her to pay $48,500 for tuition and $28,500 for a paraprofessional. Plaintiffs filed a due process complaint on September 7, 2012.

Once again, an IHO was assigned to adjudicate the matter. Hearings before the IHO concluded on March 14, 2013. In a decision dated April 18, 2013, the IHO ruled in favor of plaintiffs. The IHO ordered the DOE to fund M.M.'s placement at Cooke for the 2012-13 school year, including the cost of a

paraprofessional. In his decision, the IHO ruled that the DOE failed to offer M.M. a FAPE because she requires full-time special education classes. Moreover, the IHO held that the DOE failed to prove that a 15:1 class was appropriate for M.M. The IHO also found that Cooke was a proper placement for M.M. and that the equities favored plaintiffs.

The DOE appealed the IHO's decision, and in a decision dated November, 17, 2014, an SRO reversed. The SRO held that the CSE reviewed appropriate records in developing M.M.'s IEP. Further, the SRO concluded that the classes and services recommended in the IEP for the 2012-13 school year "aligned with the student's performance profile and were reasonably calculated to enable the student to receive educational benefits, and thus, offered the student a FAPE." (II-SRO at 8). Again, the SRO found plaintiffs' arguments regarding the recommended public school site speculative because M.M. never attended the school listed in the FNR.

Plaintiffs appealed the SRO's reversal of the IHO decision regarding the 2012-13 school year to the federal district court in a complaint dated March 12, 2015.

## DISCUSSION

### I. *Standard of Review*

### A. Summary Judgment Standard

The parties have filed cross-motions for summary judgment. A motion for summary judgment in an IDEA case, however, is "in substance an appeal from an administrative determination." *M.H. v. New York City Dep't of Educ.*, 685

9

F.3d 217, 226 (2d Cir. 2012). Thus, it requires "more than an inquiry into possible disputed issues of fact," *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005), because in an IDEA case, a disputed issue of material fact will not necessarily defeat a motion for summary judgment, *Scott*, 6 F. Supp. 3d at 434. The Court "in such cases conducts an independent judicial review" of the appealed decision. *A.M. ex rel. Y.N. v. New York City Dep't of Educ.*, 964 F. Supp. 2d 270, 277 (S.D.N.Y. 2013).

Nonetheless, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007). While this Court bases its decision on the preponderance of the evidence, 20 U.S.C. §1415(i)(2)(C)(iii), it must also give "due weight" to the administrative proceedings, *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). The Second Circuit has held that "[w]here the IHO and SRO disagree, reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." *M.H.*, 685 F.3d at 246. If, however, "the SRO's determinations are insufficiently reasoned . . . , and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis." *Id.*

### B. *Burlington/Carter* Test

A claim for tuition reimbursement under the IDEA is analyzed using a three-pronged test, known as the "*Burlington/Carter* test." *See Scott*, 6 F. Supp. 3d at 436. This test considers (1) whether the school district's proposed IEP was inappropriate, (2) whether the parents' unilateral placement was appropriate, and (3) equitable factors. *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 76 (2d Cir. 2014); *F.O.*, 976 F. Supp. 2d at 512. Tuition reimbursement is generally warranted if the IEP was inappropriate and the private school was appropriate to the child's needs. *L.K. ex rel. Q v. Ne. Sch. Dist.*, 932 F. Supp. 2d 467, 486 (S.D.N.Y. 2013). Under the third prong, "the district court enjoys broad discretion in considering equitable factors relevant to fashioning relief." *Gagliardo*, 489 F.3d at 112.

### II. *Claims for Tuition Reimbursement*

### A. Appropriateness of the IEPs

"When a State's decision under the IDEA is challenged in federal court, a court conducts a review of both the procedural and substantive adequacy of the underlying decision." *B.O. v. Cold Spring Harbor Cent. Sch. Dist.*, 807 F. Supp. 2d 130, 134 (E.D.N.Y. 2011). The school district's procedure was adequate if it complied with the procedures set forth in the IDEA, *R.E.*, 694 F.3d at 190, and its decision was substantively adequate if it was "reasonably calculated to enable the child to receive educational benefits," *Rowley*, 458 U.S. at 206-07. While "[s]ubstantive inadequacy automatically entitles the parents

11

to reimbursement," procedural violations "only do so if they impeded the child's right to a [FAPE], significantly impeded the parents' opportunity to participate in the decisionmaking process, or caused a deprivation of educational benefits." *R.E.*, 694 F.3d at 190. Here, plaintiffs allege that defendants committed both procedural and substantive errors in developing M.M.'s IEPs for the 2011-12 and 2012-13 school years. These violations, according to plaintiffs, denied M.M. a FAPE.

### 1. **Procedural Adequacy**

The procedures used by the DOE in developing M.M.'s IEPs for both the 2011-12 and 2012-13 school years were inadequate. These procedural violations denied M.M. a FAPE. A CSE's procedures are only adequate if they give the parents of a child with a disability an opportunity to participate in the development of the IEP. 20 U.S.C. §1415(b)(1). If a plan "is predetermined by the state" (i.e., the school district has an unofficial policy of not offering certain programs), it is procedurally flawed. *E.G. v. City Sch. Dist. of New Rochelle*, 606 F. Supp. 2d 384, 388 (S.D.N.Y. 2009) (citing *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 857-58 (6th Cir. 2004)).

At one of the IHO hearings regarding the 2011-12 reimbursement claim, Ms. Giurato, the DOE representative, testified that a 12:1 program does not exist at the high school level in the DOE's community schools. Specifically, Ms. Giurato stated, "[t]here is no 12:1:1 in a community school. It would have to be in a District 75 program, and the 12:1:1 in a District 75 program is for children who [have a learning disability]." (I-Tr. 206:6-9). Since these students were

12

typically "reading on a first to second grade level," (I-Tr. 206:19), while M.M. was reading on a fourth grade level, M.M. was not a good fit for the District 75 program. Ms. Giurato testified that although there is no 12:1 program in the community high schools, "[t]he 12:1 in the elementary school, middle school, is the equivalent of the 15:1 in the high school." (I-Tr. 207:3-5).

The IHO presiding over the dispute for the 2011-12 school year was not persuaded by this testimony, writing that it was "conclusory" and "not convincing." (I-IHO at 5). The IHO held "[i]t is clear that the CSE changed M.M.'s class size recommendation from 12:1 to 15:1 simply because she was now a high-school aged student and the DOE's high schools do not have 12:1 classes." (I-IHO at 5).

The SRO reviewing the case for the 2011-12 school year disagreed, noting that Ms. Giurato also testified that the CSE "recommended a 15:1 special class placement on the IEP because the student's academic skills were similar to other students that would attend a 15:1 setting." (I-SRO at 8). The SRO went on to say "[c]ontrary to the parents' contention that the student's special education needs would be better served in a 12:1+1 special class placement, the district representative indicated that the . . . CSE rejected that placement option because the student exhibited higher academic skills than students in a 12:1+1 special class placement." (I-SRO at 8).

Plaintiffs now ask the Court to reject the SRO's conclusion and reinstate the IHO's conclusion. Specifically, plaintiffs allege that the 2011-12 IEP was procedurally inadequate because "the DOE's representatives came into the CSE

meeting having already concluded that M.M. would be placed in a 15:1 program irrespective of her educational needs." (Pls.' Mot. for Summ. J. at 15). Defendants, on the other hand, urge the Court to adopt the SRO's finding on this issue, pointing out that (1) the SRO's decision deserves deference, and (2) M.M.'s "skills were similar to those of other students placed in 15:1 special classes and too high for placement in a District 75 special school program such as 12:1:1." (Defs.' Cross-Mot. for Summ. J. at 15-16). Plaintiffs' argument on this particular point is that "[b]ecause the DOE established a 12:1:1 program for only the students with the most severe learning disabilities, *and not necessarily all students whose needs require it*, it [is] not surprising that M.M.'s 'academics are higher than the profile of the students in a 12:1:1 class.'" (Pls.' Mot. for Summ. J. at 17).

The Court holds that M.M. was denied a FAPE on procedural grounds because the CSE would apparently never recommend a 12:1 class for a tenth-grade student like M.M. even if all evidence supported this type of placement. On cross-examination, Ms. Giurato was asked, "So if the CSE found 12 appropriate students to go into a 12:1 class, it could never happen?" (I-Tr. 297:9-11). Ms. Giurato answered, "I don't believe so. In my understanding it's a 15:1 . . . for the high school." (I-Tr. 297:12-13). Thus, the Court adopts the IHO's conclusion that, for the 2011-12 school year, "[t]he decision to change the staffing ratio from 12:1 to 15:1 was not based on M.M.'s individual and unique special education needs." (I-IHO at 5). Since one explicit purpose of the IDEA is to ensure that children with disabilities are offered a program

"designed to meet their unique needs," 20 U.S.C. §1400(d)(1)(A), M.M. was denied a FAPE for the 2011-12 school year.

The Court disregards the SRO's finding for the 2011-12 school year that the CSE's recommendation of a 15:1 class was based on M.M.'s academic performance because the SRO did not consider the fact that a 12:1 program did not exist at a community high school. While the SRO was persuaded by Ms. Giurato's testimony that a 12:1 placement option was considered but rejected because M.M. "exhibited higher academic skills" than other students in these classes, the Court need not defer to this conclusion because it was not adequately reasoned. Since the DOE had only established 12:1 classes in District 75 programs for students with heightened learning disabilities, it follows that students with other degrees of learning impairments would necessarily outperform the typical student in such a 12:1 class and, thus, never be recommended for a 12:1 placement. Because the SRO failed to analyze this issue, and did not mention that a 12:1 high school class did not exist, the Court adopts the IHO's more carefully considered decision instead.

Defendants argue that plaintiffs' predetermination argument is waived because it was not raised in plaintiffs' due process complaints. Defendants also claim "neither the IHO nor the SRO in either of the proceedings addressed the issue, and the Court has no record for review." (Defs.' Cross-Mot. for Summ. J. at 20). This is incorrect. As a preliminary matter, the Court recognizes that "the scope of the inquiry of the IHO, and therefore also of the SRO and this Court, is limited to matters either raised in the plaintiffs' Due Process Complaint or

agreed to by the defendant." *C.U. v. New York City Dep't of Educ.*, 23 F. Supp.
3d 210, 223 (S.D.N.Y. 2014); *see also* 20 U.S.C. §1415(f)(3)(B). This waiver rule,
however, "is not to be mechanically applied" because "the IDEA itself
contemplates some flexibility." *C.F.*, 746 F.3d at 78. In other words, "[t]he
statute does not require that alleged deficiencies be detailed in any formulaic
manner." *Id.*

Here, in plaintiffs' amended due process complaint for the 2011-12
school year, plaintiffs put defendants on notice that they intended to present
evidence both that (1) "the District's recommended classroom staffing ratio of
15:1 [was] inappropriate for meeting [M.M.]'s needs" and (2) "the District's
proposed placement [was] procedurally defective." (I-Dist. Ex. 1). Although
plaintiffs did not specifically use the word "predetermination" in their amended
due process complaint, their allegations in the complaint clearly put
defendants on notice that plaintiffs were at least generally challenging the 15:1
staffing ratio recommended by the CSE. Then, on direct examination at a
hearing before the IHO, the DOE's representative revealed that there is no 12:1
class in a community school. This testimony implied that the CSE's 15:1
recommendation for M.M. may have been predetermined. Plaintiffs' counsel
appropriately followed up on this point on cross examination and raised it in
plaintiffs' closing brief before the IHO. There is no indication that plaintiffs'
waived the argument by not addressing it at the proceedings below.

Moreover, as discussed above, the IHO specifically held that the CSE's
decision to change the staffing ratio from 12:1 to 15:1 was made because the

DOE's high schools do not have 12:1 classes. Although the SRO's discussion did not analyze this issue (which, among other reasons, gives this Court reason to defer to the IHO's decision), the SRO noted at the outset that the IHO was persuaded by the "lack of 12:1 special class placements at district high schools." (I-SRO at 4). Again, while the word "predetermination" may not have appeared in the parties' papers until later, the crux of the argument was apparent. Thus, the DOE had notice of the claim, this Court has an ample record for review, and the argument is not waived for the 2011-12 school year.

Turning to the 2012-13 school year, the Court once again holds that M.M. was denied a FAPE on procedural grounds because the CSE would presumably never recommend a 12:1 placement for M.M. even if all of the evidence pointed toward such a recommendation. The IHO found the 15:1 placement inappropriate because, among other reasons, "no evidence was presented to persuasively demonstrate that [M.M.] would obtain an educational benefit in a class this large." (II-IHO at 10). The SRO reversed, holding that the IEP for the 2012-13 school year was "reasonably calculated to enable the student to receive educational benefits." (II-SRO at 8). But the SRO did not specifically analyze whether the lack of a 12:1 placement option for M.M. had any effect on the CSE's recommendation, nor did the SRO discuss plaintiffs' procedural argument that the staffing ratio was predetermined. Thus, the Court concludes that M.M.'s access to a FAPE was impaired on procedural grounds for the 2012-13 school year. Again, this argument was not waived because the due process complaint for the 2012-13 school year directly

challenged the 15:1 staffing ratio and claimed that a 12:1 ratio would better address M.M.'s needs. These allegations formed the foundation of the predetermination argument and the DOE was on notice of them from the due process complaint. Moreover, the staffing ratio was discussed in testimony before the IHO, and plaintiffs alleged in their closing brief for the IHO that "[t]he DOE did not consider any program except the one it had predetermined for [M.M.]," (II-IHO Ex. 6). Because the IDEA does not require plaintiffs' allegations to be detailed formulaically, the predetermination argument is not waived for the 2012-13 school year.

Accordingly, the Court holds that the DOE's procedural violations denied M.M. a FAPE for both the 2011-12 and 2012-13 school years.

## 2. **Substantive Adequacy**

The Court holds that, in addition to receiving a procedurally inadequate FAPE, M.M. received a substantively inadequate FAPE for both the 2011-12 and 2012-13 school years. Plaintiffs allege that the DOE's recommended 15:1 staffing ratio and proposal to place M.M. in certain general education classes were substantively inappropriate. Defendants ask the Court to defer to the SRO's decision for both school years, which held that the IEPs were substantively adequate. In particular, defendants argue that the IEPs were "reasonably calculated to enable M.M. to receive educational benefits" and "were tailored to her unique needs." (Defs.' Cross-Mot. for Summ. J. at 14-15).

Generally, "class size and instructional programming are matters of educational policy concerning which courts defer to a state administrative

18

officer." *F.O.*, 976 F. Supp. 2d at 511. Thus, the Court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189; *see also B.R. ex rel. K.O. v. New York City Dep't of Educ.*, 910 F. Supp. 2d 670, 675 (S.D.N.Y. 2012) (explaining that where the SRO reverses the IHO, "the court should give substantial deference to the SRO's views of educational policy, but less to the SRO's factual findings or to its reasoning in general"). Here, for the reasons discussed below, the Court does not defer to the SRO's conclusions because they were inadequately reasoned.

For the 2011-12 school year, the IHO wrote that "[i]t was clear from the testimony of the Parents' witnesses from Cooke that M.M. still needs the support that is provided in a 12:1 class." (I-IHO at 5). The SRO, however, held that a 15:1 class was appropriate, citing Ms. Giurato's testimony that M.M.'s academic skills were similar to those of other students who would be placed in a 15:1 class. This rationale, however, does not explain why a 15:1 class would produce progress for M.M. in particular and how it would afford her an opportunity for more than mere trivial advancement, as is required by the IDEA.

Moreover, the SRO's conclusion regarding the 15:1 staffing ratio is not supported by the record. For example, the assistant head of Cooke, Dr. Francis Tabone, who "know[s] [M.M.] very well" and understands "the progress that she's made over the last couple of years," (I-Tr. 485:15-20), testified that "[i]n

no way should [M.M.] be placed in a classroom size that big of 15:1. The amount of individualized support and attention it would take just for basic communication issues . . . would require a much smaller setting," (I-Tr. 494:22-495:1). Dr. Tabone also stated that in "[a] 15:1 class [M.M.] would just completely get lost and not have the kind of support she would need for any kind of meaningful academic participation and much less any growth." (I-Tr. 495:8-11). Similarly, M.M.'s English teacher at Cooke, Mary Clancy, was asked whether M.M. could function in a class of fifteen students, and Ms. Clancy replied, "[S]he needs more support than that. . . . [S]he needs a lot of adult support to make sure she's getting the targeted skills and tracking everything that she needs." (I-Tr. 620:24-621:7). The SRO did not specifically reference Dr. Tabone's testimony or Ms. Clancy's testimony, but the SRO approved of a 15:1 class for M.M. based on the DOE representative's testimony that M.M.'s skills were similar to those of other students who would attend a 15:1 class.

The SRO's decision is problematic because it did not address conflicting testimony and failed to take into account the IHO's credibility determinations. When the DOE representative was asked whether she had performed a classroom observation of M.M., she said she could not remember but "must have at some point in the past." (I-Tr. 216:12-21). Moreover, the IHO—the individual who presided over the hearings and was best positioned to evaluate witness credibility—declined to give much weight to the representative's testimony about the CSE meeting because it "appeared to be exclusively based upon her review of the IEP prepared that day and of the CSE meeting minutes."

(I-IHO at 4). The Court finds the IHO's conclusion here to be well-reasoned: "Although it is understandable that a witness who participates in a hundred or more CSE meetings a year will not specifically remember a meeting that occurred a year before her testimony, that lack of recollection unfortunately reduces the reliability of the testimony." (I-IHO at 4-5).

The IHO went on to conclude that "[n]either Ms. Giurato's testimony nor the DOE's documentary evidence was sufficient to establish that the CSE's recommendation for placement in a 15:1 program was reasonably calculated to provide M.M. with the opportunity to make meaningful educational progress." (I-IHO at 5). Because the SRO failed to parse these conflicting witness accounts and did not analyze whether M.M. would, as Dr. Tabone testified, "completely get lost" in a 15:1 class, the Court adopts the IHO's conclusion that M.M. was denied a FAPE for the 2011-12 school year because a 15:1 class would not meet her unique special education needs. *See S.B. v. New York City Dep't of Educ.*, 117 F. Supp. 3d 355, 373 (S.D.N.Y. 2015) (holding that an "SRO's reliance on *one* district special education teacher's contention that [a student] did not require 'any additional teaching support' over the testimony of *two* teachers who knew [the student] and taught [the student] in class—*without noting the IHO's finding of credibility for or against any witness*—flies in the face of reason").

The Court holds that the IEP for the 2012-13 school year was also substantively inadequate based on the 15:1 staffing ratio. The IHO reviewing the 2012-13 recommendation by the CSE found that "no evidence was

21

presented to persuasively demonstrate that the Student would obtain an educational benefit in a class this large." (II-IHO at 10). The SRO reversed, writing "[i]n reaching the decision to recommend a 15:1 special class placement at a community school . . . [,] the district school psychologist testified that the March 2012 CSE considered the student's current levels of functioning, the parents' concern that the student take Regents courses, and the student's [least restrictive environment]." (II-SRO at 7). The SRO, however, did not weigh this testimony against conflicting evidence. For example, Sally Ord, who works in student support services at Cooke, stated that she disagreed with the 15:1 recommendation because it "would not meet both [M.M.]'s academic needs . . . and also her functional emotional needs." (II-Tr. 222:25-224:1). The SRO also wrote that the IEP for the 2012-13 school year was designed "to further support the parents' request for the student to participate in Regents assessments." (II-SRO at 7). But plaintiffs never requested that M.M. take the Regents exam. In fact, when J.M. was asked whether a Regents diploma was appropriate for M.M., she replied "absolutely not." (II-Tr. 276:22-277:2).[2] In light of these issues, the Court need not defer to the SRO's conclusion that the 2012-13 IEP was substantively appropriate for M.M. Instead, the Court adopts the IHO's finding that the IEP failed to offer M.M. a FAPE.

Plaintiffs also argue that, even if a 15:1 special class was appropriate for M.M., the CSE's recommendations for the 2011-12 and 2012-13 school years

---

[2] Defendants have conceded that the SRO erred on this point. (*See* Defs.' Cross-Mot. for Summ. J. at 18-19).

were nonetheless substantively inadequate because M.M. would attend general education classes for part of the school day. The IHOs held in favor of plaintiffs for both school years. In the 2011-12 decision, the IHO noted that the CSE's placement included some classes in the general education setting, even though "the IEP prepared by the CSE acknowledge[d] that M.M. [could] not be educated in the general education classroom." (I-IHO at 5). Similarly, in the 2012-13 decision, the IHO found that for "almost half the school day, the Student would be placed in general education classes without any special education supports . . . . Significantly, the CSE team agreed that placement in a general education setting was inappropriate." (II-IHO at 9).

Defendants disagree with the IHO's characterization of the amount of time M.M. would spend in general education classes each week, but acknowledge that she "would attend general education classes for non-academic classes such as music and art." (Defs.' Reply at 11; 12 n.8). For the 2011-12 school year, the SRO found that M.M.'s placement in certain general education classes did not amount to a denial of a FAPE because "the district would have been able to implement the student's IEP without substantial deviation from its terms." (I-SRO at 13). The SRO did not specifically address the issue for the 2012-13 school year but found that, overall, the IEP "aligned with the student's performance profile and [was] reasonably calculated to enable the student to receive educational benefits." (II-SRO at 8).

The Court adopts the IHOs' conclusions that the general education placement for both school years was problematic. When asked whether M.M.

23

would succeed in a general education art class, Dr. Tabone replied, "No I don't think she could based on her physical limitations. . . . If you're doing painting, or drawing, or perspective drawing and things like that, which she's not capable of doing, that would be inappropriate but it would also be terrible for her to sit in a class where everyone's doing something that she cannot participate in. That would be damaging to self-esteem . . . ." (I-Tr. 472:3-21). The Court once again recognizes that it lacks the specialized knowledge necessary to decide complex questions of educational policy; however, where, as here, the SRO did not provide any reasoning for discounting conflicting evidence, the Court may defer to the IHO's more thorough decision. *See F.O.*, 976 F. Supp. 2d at 511.

Finally, the parties dispute whether Murry Bergtraum was an appropriate placement for the 2011-12 school year and whether Marta Valle was an appropriate placement for the 2012-13 school year. Having already found that the IEPs for both school years were procedurally and substantively inadequate, the Court need not reach the issue of their implementation. The Court notes, however, that the SRO's conclusions here would not receive deference because of a change in Second Circuit law that occurred after the SRO decisions were issued. For both school years, the SRO held that plaintiffs' arguments about the assigned public school sites were speculative because they enrolled M.M. at a private school before the DOE became obligated to implement the IEPs. Thus, the SRO concluded for both school years that plaintiffs could not prevail on their implementation claims because M.M. never

attended the proposed public school sites.[3] The SRO cited the Second Circuit's
2012 decision in *R.E. v. New York City Department of Education*, 694 F.3d 167,
to support these findings. But the SRO's decisions in these matters were made
before the Second Circuit's recent decision in *M.O. v. New York City Department
of Education*, 793 F.3d 236, 244 (2d Cir. 2015), which clarified that "*R.E.* does
not foreclose all prospective challenges to a proposed placement school's
capacity to implement a child's IEP." Thus, the SRO's conclusions that
plaintiffs' implementation claims fail because they are speculative would
deserve no deference in light of *M.O. See, e.g.*, *E.P. v. New York City Dep't of
Educ.*, No. 15-cv-0606, 2016 WL 3443647, at *8-9 (S.D.N.Y. June 10, 2016)
(finding that *M.O.* "makes clear that the SRO erred in her conclusion that there
are no circumstances in which parents may challenge a proposed school their
child did not attend"); *W.W. & D.C. v. New York City Dep't of Educ.*, 160 F.
Supp. 3d 618, 627 (S.D.N.Y. 2016) (holding that an SRO's determination that
arguments concerning an assigned public school site were speculative was due
no deference because "[t]his broad interpretation of *R.E.*, though not foreclosed
at the time the SRO rendered his decision, was rejected by the Second Circuit
in *M.O.*").

In sum, the Court holds that the DOE denied M.M. a FAPE for the 2011-
12 school year and the 2012-13 school year because the IEPs for both were
substantively inadequate. Either these substantive violations, or the procedural

---

[3] In the 2011-12 decision, the SRO held that, even if plaintiffs could make speculative claims,
they would nonetheless fail. (*See* I-SRO at 12-14). In the 2012-13 decision, however, the SRO
did not reach the merits of plaintiffs' implementation argument.

violations discussed in subsection II.A.1 *supra*, resolve the first prong of the *Burlington/Carter* test in favor of plaintiffs.

## B. Appropriateness of the Unilateral Placements

For both school years, the IHOs held that Cooke was an appropriate placement for M.M. The SRO declined to reach the issue both times, and the parties have not addressed the issue in their briefs. Therefore, the Court defers to the IHOs' conclusions that Cooke was an appropriate unilateral placement. Prong two of the *Burlington/Carter* test is satisfied.

## C. Equitable Factors

The IHOs also held that the equities favored reimbursement for both school years. Again, the SRO did not reach the issue in either case, and the parties have not raised the matter in their briefs. Accordingly, the Court defers to the IHOs' findings for prong three of the *Burlington/Carter* test and holds that the equities favored tuition reimbursement for both school years.

## CONCLUSION

For the reasons discussed above, for both the 2011-12 school year and the 2012-13 school year, plaintiffs' motion for summary judgment is granted and defendants' motion for summary judgment is denied. The Court orders defendants to reimburse M.M.'s Cooke tuition and paraprofessional costs for the 2011-12 school year and 2012-13 school year.

Additionally, pursuant to 20 U.S.C. §1415(i)(3)(B), the Court may award reasonable attorneys' fees and costs to plaintiffs. The Court directs the parties

to confer regarding attorneys' fees in an effort to reach an agreement. If the parties are unable to agree, they shall submit a proposed briefing schedule on the issue for the Court's approval.

This opinion resolves the motions listed at docket numbers 17 and 20 for case number 15-cv-01895, and docket numbers 18 and 21 for case number 15-cv-01898. The Clerk of Court is directed to terminate these motions and close both cases.

SO ORDERED.

Dated:  New York, New York
        September 30, 2016

Thomas P. Griesa
United States District Judge

27